**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

———————————————————————

|  |  |
|---|---|
| **SALEM SHIFT LLC and**<br>**KAYLA PAIGE BESSE,** | )<br>)<br>)<br>) |
| **Plaintiffs,** | )<br>) |
| **v.** | )<br>)<br>) |
| **BUFFALO PEDAL TOURS, LLC,**<br>**KEN SZAL, and BAVISTA LLC,** | )<br>)<br>)<br>) |
| **Defendants.** | )<br>)<br>) |

**Case No. 21-cv-11418-DJC**

———————————————————————

<u>MEMORANDUM AND ORDER</u>

**CASPER, J.**                                                    **September 18, 2023**

**I.      Introduction**

Plaintiffs Salem Shift LLC ("Salem Shift") and Kayla Paige Besse ("Besse"), the managing member of Salem Shift, have sued Defendants Bavista LLC ("Bavista"), Buffalo Pedal Tours, LLC, ("Buffalo Pedal"), and the companies' managing member, Ken Szal ("Szal") (collectively, "Defendants"), concerning the sale of a multi-person bicycle.  D. 1.   Plaintiffs assert claims for breach of contract (Count I), unfair and deceptive practices in violation of Mass. Gen. L. c. 93A (Count II) and negligence (Count III).  <u>Id.</u>  Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.  D. 10.  For the reasons stated below, the Court DENIES the motion.

## II.    Factual Background

The Court draws the following factual allegations from Plaintiffs' complaint, D. 1, as well as from the affidavits and exhibits filed in connection with the motion to dismiss.  See D. 11; D. 16; D. 23.[1]

Salem Shift is a limited liability company organized under the laws of Massachusetts with its place of business in Massachusetts as well.  D. 1 ¶ 2.  Besse, the managing member of Salem Shift, is domiciled in Massachusetts.  Id.  ¶ 3.  Bavista is a New York limited liability company organized under the laws of New York with its headquarters in Buffalo, New York, doing business under the name Buffalo Pedal.  D. 11-4 ¶¶ 4, 33 (averring that Szal is "member and principal of Bavista LLC, d/b/a Buffalo Pedal Tours" and denying existence of associated legal entity named "Buffalo Pedal Tours, LLC"); but see D. 1 ¶¶ 4–6 (alleging that Bavista and Buffalo Pedal are two separate LLCs operating in concert).[2]  Szal, the managing member of Bavista and Buffalo Pedal, is domiciled in New York.  D. 1 ¶ 5.

In late 2020, Besse decided to start a business in Salem, Massachusetts offering group pedal bike tours, which allow for a dozen or more people to ride a "group bicycle" around the city.  Id. ¶ 10–11.  In November 2020, she started discussions with officials for the City of Salem and Commonwealth of Massachusetts about the permissions she would need to operate this business. Id. ¶ 15.  She applied to Salem for a pedicab license and registered "Salem Shift LLC" with the Massachusetts Secretary of State.  Id. ¶¶ 15–17.

[1] On a motion to dismiss under Fed. R. Civ. P. 12(b)(2) and as explained further below, the parties and the Court may "go beyond the pleadings" to determine whether plaintiff has "ma[d]e affirmative proof."  United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 619 (1st Cir. 2001) (citation omitted); see Sawtelle v. Farrell, 70 F.3d 1381, 1386 (1st Cir. 1995).

[2] In light of Szal's uncontroverted declaration as to the organization of the business operating under the name "Buffalo Pedal Tours," D. 11-4 ¶¶ 33–34, the Court construes Defendants Buffalo Pedal and Bavista to be the same entity.

On November 20, 2020, Besse contacted Buffalo Pedal about the company's custom-made fifteen-passenger bikes, using an order form available on the company's website. D. 11-1; D. 16 ¶ 13. She became interested in the company after searching online for companies that manufacture group bikes and encountering the Buffalo Pedal website in the Google Search results. D. 16 ¶¶ 6, 13; D. 16-1. Szal emailed Besse on November 24, 2020, to confirm her interest. D. 16 ¶ 14.

Over several months in early 2021, Besse and Szal discussed her potential purchase. On February 23, 2021, the two exchanged emails to schedule a phone call to discuss purchasing a pedal bike. D. 16 ¶¶ 15–16. Szal called her at her residence in Salem that day and she told him she was considering several companies. Id. On March 3, 2021, at his direction, Besse called him to compare features of Buffalo Pedal's product with those produced by CyclePub in Bend, Oregon, another supplier she was considering. Id. ¶ 16. Around April 17, 2021, Szal called Besse and invited her to visit Buffalo to learn more about his business. Id. ¶ 17. He had emailed a similar invitation on March 3, 2021. Id. On April 22, 2021, Besse traveled to Buffalo to meet with Szal and learn about his tour business and group pedal bike. D. 1 ¶ 18; D. 16 ¶ 18. Besse explained her plans to him, and he represented "the high quality of the 15-person pedal bike," "how it was well suited for the bike tours she was planning," and "how well the Buffalo Pedal bike operated and its reliability." D. 1 ¶ 19. Although Szal attempted to sell Besse a bike during that trip, she did not buy one at that time. D. 16 ¶ 18.

In May 2021, Besse decided to buy a bike from Buffalo Pedal and notified Szal of this decision by email on May 6, 2021. D. 16 ¶ 20. Around this time, he called her in Salem promising to send a list of tools needed for bike maintenance, although he never did so. Id. ¶ 22. On May 18, 2021, Besse paid Bavista a $10,000 deposit toward the total purchase price of $57,900. D. 1 ¶ 20; D. 16 ¶ 23. In exchange, Szal warranted that he would manufacture a pedal bike that was reliable

and suited for its intended purpose.  D. 1 ¶ 20.  Two days later, Besse made a formal presentation to the Ordinance, Licenses and Legal Affairs Committee of the Salem City Council, which referred the matter of approval to the full city council.  Id. ¶ 21.

On June 22, 2021, Besse paid Szal, Buffalo Pedal, and Bavista the balance owed for the pedal bike, an amount of $47,900.  Id. ¶ 22.  The next day, Salem granted permission for Salem Shift to commence operations on a trial basis.  Id. ¶ 23.  For delivery, Szal called Besse in Salem and offered to connect her with a traditional third-party carrier or to have his friend, Mike Pulk ("Pulk"), deliver the bike for roughly half the price, if the fee was paid in cash.  D. 16 ¶ 26.  He also made this offer via email and text message to Besse.  Id. ¶ 26.  She accepted this offer and, on June 24, 2021, the bike was delivered to Salem Shift in Salem.  Id. ¶¶ 26–27.  The day before delivery, Szal stated that he would send Besse a video with instructions on the operation of the bike, but never did so.  Id. ¶ 28.

Having received the bike, Besse prepared to launch her business.  She hired employees and obtained positive press on the front page of *The Salem News*.  D. 1 ¶ 25.  On July 17, 2021, she began to receive online bookings for pedal tours.  Id. ¶ 28.  Based upon these initial bookings and early enthusiasm, Salem Shift estimates its first year of net profits would have been around $150,000.  Id. ¶ 29.  Besse held a test drive of the new group bike with friends and family as passengers on July 17, 2021.  D. 1 ¶ 30.  When passengers began to pedal, the pedals "froze" and the bike would not move.  Id. ¶ 31.  The resistance of the bike was so strong that it was difficult to push it back into the storage area.  Id.

Salem Shift immediately contacted Szal, who promised to have a technician contact Besse and to troubleshoot the problem over the phone with her himself, but neither occurred.  Id. ¶ 31; D. 16 ¶¶ 30–31. Over the next few days, Besse contacted people with expertise to fix the bike, but Szal

emailed her not to allow anyone other than a Buffalo Pedal employee to work on the bike, otherwise any warranties would be voided.  D. 1 ¶ 32; D. 16 ¶ 32.  On July 20, 2021, Szal told Besse by email that it would take him 90 days to acquire a replacement motor.  D. 1 ¶ 33; D. 16 ¶ 33.  On July 22, 2021, following further conversation between Szal and Salem Shift, Pulk came to Salem to retrieve the bike and Buffalo Pedal refunded $58,100, comprising the purchase price of the bike and a replacement horn, to Salem Shift.  D. 16 ¶¶ 35–36; D. 16-3 at 5.

## III.    Procedural History

 Salem Shift and Besse initiated this lawsuit against Defendants on August 30, 2021.  D. 1.  Defendants have now moved to dismiss for lack of personal jurisdiction under Rule 12(b)(2).  D. 10.  This matter was recently transferred to this session of the Court.  D. 28; D.  29.  Having reviewed Defendants' motion papers, D. 10–11, Plaintiffs' opposition to same, D. 15–16, the transcript of the July 13, 2022 motion hearings, D. 22, and the parties' supplemental, post-hearing filings, D. 23–D. 24,[3] the Court has considered the motion and explains its ruling regarding same in this Memorandum and Order.

## IV.    Standard of Review

When ruling on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, a district court applies the *prima facie* standard of review.  <u>Swiss Am. Bank</u>, 274 F.3d at 618 (citation omitted).  "Under this standard, it is plaintiff's burden to demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution."  <u>Id.</u> (citation omitted).  The Court considers the facts alleged in the pleadings as well as the parties' supplemental filings, including affidavits.  <u>Sawtelle</u>, 70 F.3d at

---

[3] Upon the transfer of this case to this session, the Court gave counsel the option for oral argument in this session, D. 29.  Since that offer was declined, the Court has considered the matter on the papers and the July 13, 2022 transcript.

1385 (citing cases); <u>Ticketmaster-N.Y. v. Alioto</u>, 26 F.3d 201, 203 (1st Cir. 1994). The Court will "take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim." <u>Mass. Sch. Of L. at Andover, Inc. v. Am. Bar Ass'n</u>, 142 F.3d 26, 34 (1st Cir. 1998) (citation omitted). But it will "not credit conclusory allegations or draw farfetched inferences." <u>Ticketmaster</u>, 26 F.3d at 203. The plaintiff needs to "do more than simply surmise the existence of a favorable factual scenario; he must verify the facts alleged through materials of evidentiary quality." <u>Killion v. Commonwealth Yachts</u>, 421 F. Supp. 2d 246, 252 (D. Mass. 2006) (citation omitted). The Court also "add[s] to the mix facts put forward by the defendants, to the extent that they are uncontradicted." <u>Mass. Sch. Of L.</u>, 142 F.3d at 34.

## V.   Discussion

To determine whether personal jurisdiction is proper, the Court considers the application of the Massachusetts long-arm statute and due process analysis. <u>Kuan Chen v. United States Sports Academy, Inc.</u>, 956 F.3d 45, 54 (1st Cir. 2020).

### A.   Massachusetts Long-Arm Statute

Salem Shift relies upon three sections of the Massachusetts long-arm statute, Mass. Gen. L. c. 223A, §3(a), § 3(b) and § 3(c).

#### 1.   § 3(a)

Under § 3(a), "[a] court may exercise personal jurisdiction over a person . . . as to a cause of action in law or equity arising from the person's . . . transacting any business in this commonwealth." Mass. Gen. L c. 223A, § 3(a). The Court must "construe[] the transacting any business language of the statute in a generous manner, and . . . must focus on whether the defendant[s] attempted to participate in the commonwealth's economic life." <u>Cossart v. United Excel Corp.</u>, 804 F.3d 13, 18 (1st Cir. 2015) (internal quotation marks omitted) (quoting <u>United</u>

Elec., Radio & Mach. Workers of Am. V. 163 Pleasant St. Corp., 960 F.2d 1080, 1087 (1st Cir.

1992)).  "In deciding whether a claim 'aris[es] from' a defendant's 'transacting business,' . . . [the

Court] looks to see whether the transacted business was a 'but for' cause of the harm alleged in the

claim."  Id. (quoting Tatro v. Manor Care, Inc., 416 Mass. 763, 770–71 (1994)).

Although a communication sent to a Massachusetts business is not necessarily enough on

its own to establish personal jurisdiction, "just a few such acts may satisfy the long-arm statute."

Saturn Mgmt. LLC v. GEM-Atreus Advisors, LLC, 754 F. Supp. 2d 272, 278 (D. Mass. 2010).

"[T]he focus is on the contacts relating to the formation of the contract; those contacts ordinarily

must be instrumental to its formation to establish jurisdiction."  Id.  (internal citations and quotation

marks omitted).  "[E]xtensive post-contract communications that relate to the operation of the

contract itself" may also be deemed transacting business."  Id.  internal citations and quotation

marks omitted).

As to whether the cause of action arises from the transaction of business, the relevant inquiry

is whether "the claim was made possible by, or lies in the wake of, the transaction of business in

the forum State."  Tatro, 416 Mass. at 771.  "The inquiry ultimately boils down to a 'but for'

causation test which asks '[d]id the defendant's contacts with the Commonwealth constitute 'the

first step in a train of events that result[ed] in the personal injury.'"  Access Now, Inc. v. Otter

Prod., LLC, 280 F. Supp. 3d 287, 291 (D. Mass. 2017) (alteration in original) (quoting Lyle

Richards Int'l, Ltd. v. Ashworth, Inc., 132 F.3d 111, 114 (1st Cir. 1997)).  "The standard is not

rigorous."  Id. (citing Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34

n.3 (1st Cir. 2016)).

Employing this framework here, the Court concludes that § 3(a) supports personal

jurisdiction over Defendants.  The record before the Court shows communications from Szal to

Salem Shift representatives in Massachusetts, by phone, text and email.  D. 11-2; D. 11-3; D. 11-7;

D. 16-2; D. 16-3.  Szal's communications persuaded Besse to purchase the pedal bike.  D. 16 ¶¶ 13–

17, 20, 22–28 (describing Szal's communications, including an invitation to visit Buffalo and

inspect bikes, emails attaching invoices, arrangement of delivery and promises to send information

regarding maintenance and operation).  Szal continued to communicate with Plaintiffs after the

bikes were delivered, regarding the quality of his product and the availability of technical support.

D. 16 ¶¶ 29–36.  Under such circumstances, Szal, acting on behalf of Bavista and Buffalo Pedal,

has transacted business in Massachusetts.  See The Scuderi Grp., LLC v. LGD Tech., LLC, 575 F.

Supp. 2d 312, 319 (D. Mass. 2008) (concluding that defendants transacted business in

Massachusetts where they "reached out multiple times to Plaintiff in Massachusetts to establish a

business relationship").

        Plaintiffs' claims arise from that transaction of business.  Plaintiff alleges that Szal's

statements gave rise to contractual obligations and constituted deceptive "false promises" in

violation of c. 93A.  D. 1 ¶ 35 (alleging that "promises and representations made by Defendants

were contractual obligations for which Plaintiffs paid and upon which they relied"); id. ¶ 43

(alleging that deceptive acts and omissions included "false representations about the Defendants'

pedal bike").  But for the sale of the allegedly defective bike, Plaintiffs would also have no claim

that the contract was breached or that Defendants were negligent in the bike's manufacture or

delivery.  Id. ¶¶ 35–37, 50.

        Defendants argue that this was nevertheless the type of isolated and minor transaction

deemed not to satisfy the long-arm statute.  D. 11 at 4–5 (quoting Droukas v. Divers Training Acad.,

Inc., 375 Mass. 149, 153 (1978)).  The Court acknowledges that this case involves a single sale,

initiated by Besse's inquiry, of a product by out-of-state Defendants.  See e.g., Intech, Inc. v. Triple

"C" Marine Salvage, Inc., 444 Mass. 122, 123, 126–27 (2005) (concluding that § 3(a) was not satisfied where defendant advertised boat for sale in nationally distributed magazine, Massachusetts plaintiff inquired, defendant faxed invoice and shipped boat to plaintiff in Massachusetts and defendant called plaintiff concerning purchase of another available boat); Droukas, 375 Mass. at 153 (concluding that § 3(a) was not satisfied where "defendant's only contacts with Massachusetts were the placement of an advertisement in a publication distributed in the Commonwealth, the receipt in Florida of a telephone call from the plaintiff in Massachusetts in regard to the purchase of the two engines, the sending of correspondence to the plaintiff confirming the sale, and the shipment of the engines 'collect' to the plaintiff in Massachusetts"); REMF Corp. v. Miranda, 60 Mass. App. Ct. 905, 906 (2004) (concluding that § 3(a) was not satisfied where Massachusetts plaintiff inquired into purchase of boat after viewing nationally distributed ad, Florida seller mailed and faxed information about the boat to plaintiff in Boston, and parties negotiated deal using phone and fax).

Viewing the record in the light most favorable to jurisdiction, however, the Court concludes that the Droukas line of cases is distinguishable, because Szal's contacts with Besse in Massachusetts were instrumental to the formation of the contract. See Gleason v. Jansen, 76 Mass. App. Ct. 1128, 2010 WL 1708746, at *2 (2010) (explaining that "purposeful and successful solicitation of business from residents of the Commonwealth" may satisfy § 3(a)). Here, the transaction involved more than Besse's inquiry and Szal's confirmation of the material terms for the sale of the bike. Over the course of several months, Szal contacted Besse to convince her to choose Buffalo Pedal instead of a competitor. D. 16 ¶¶ 14–18. Szal invited Besse to call and positioned himself as a resource for her. D. 16-2 at 2 (stating that Szal had "opened in four cities and can help with the answers so feel welcome to call if you need help with stuff"); id. at 10

(offering to send video of bike operation and list of tools).  After the bike was delivered, Szal continued to provide technical support as to the replacement of a missing part and the failure of the bike on its maiden voyage.  D. 16 ¶¶ 29–33.  Given this context of communications leading to the consummation of the sale, the present case is distinguishable from Droukas.  See The Scuderi Grp., LLC, 575 F. Supp. 2d at 319 (explaining that "even an isolated, 'one-shot' transaction with little impact on the commerce of the Commonwealth may constitute transacting business"); Workgroup Tech. Corp. v. MGM Grand Hotel, 246 F. Supp. 2d 102, 109–10 (D. Mass. 2003) (concluding that the "at least four telephone calls, five emails, and three faxes sent by [defendant] to [plaintiff] in Massachusetts over a three month period that culminated in the consummation of the contract between the two parties" satisfied § 3(a) and noting that "even just a few acts on a defendant's part can often suffice to satisfy the long-arm statute's threshold" (citing cases).

Accordingly the Court concludes that § 3(a) of the long-arm statute is satisfied.

2.    *§ 3(b)*

Alternatively, Plaintiffs rely upon § 3(b) of the long-arm statute.  Section 3(b) allows personal jurisdiction over a person "as to a cause of action in law or equity arising from the person's . . . contracting to supply services or things in this commonwealth."  Mass. Gen. L. c. 223A, § 3(b). This clause refers "to the place where the services or things are to be supplied, rather than referring to the place of the contracting."  Droukas, 375 Mass. at 157. Where, however, a defendant has not explicitly contracted to deliver goods to a particular destination, courts have concluded that § 3(b) remains unsatisfied.  Id. at 157–58; Filmore v. VSP N. Am., LLC, No. CV 18-10256-MBB, 2019 WL 184075, at *7 (D. Mass. Jan. 14, 2019) (concluding that where oral agreement did not include "agreement to specifically deliver or supply the receivables to the Commonwealth," § 3(b) did not apply); Mongiardo v. Priv. Collection Motors, Inc., 100 Mass. App. Ct. 1117, 2021 WL 5912773,

at *3 (2021) (concluding that § 3(b) did not apply where plaintiff "relied on a separate carrier to deliver their goods to the Commonwealth").

As an initial matter, the Court concludes that the only written contract between the parties are the invoices sent by Szal to Besse, D. 11-5, D. 16-5, and not the "sample sales agreement" which Besse emailed to Szal on May 6, 2021.  D. 16-2 at 5; D. 11-6; D. 16-4.  The present record appears to indicate that the sales agreement was merely an unfinished draft which Besse invited Szal to edit and which the parties never executed.  D. 16 ¶¶ 20–21; D. 16-2 at 5–6.  Thus, the Court will not consider the proposed delivery terms in the sample sales agreement.

The parties submit two different versions of the invoice in connection to the motion to dismiss.  Both versions indicate that the purchase price "[i]ncludes loading expenses in Buffalo."  D. 11-5; D. 16-5. Defendants' "paid" version includes the watermark "PAID," identifies "Mike Pulk" as the shipper and states "Delivery to be paid by customer."  Plaintiffs' version lacks these features and indicates that the shipper was still "TBD," presumably "to be determined."  D. 16-5.  Plaintiffs argue, however, that even as Pulk became the shipper, Szal arranged delivery of the bike.  D. 15 at 8; D. 24 at 4.

Plaintiffs argue that § 3(b) applies because "Defendants arranged for transport of the pedal bike from New York to Massachusetts."  D. 15 at 8.  Essentially, Plaintiffs are arguing that Pulk was acting as Szal's agent when delivering the bike to Salem and thus Pulk's contacts with Massachusetts can be imputed to Szal.  Even if Szal himself did not contract to deliver the bike into Massachusetts, an agent's contacts may be imputed to the principal based on the plain language of the long-arm statute.  Mass. Gen. L. c. 223A, § 3 (providing that court may "court may exercise personal jurisdiction over a person, who acts directly or by an agent" takes certain acts relating to Massachusetts);  Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 55

(1st Cir. 2002) (explaining that "[f]or purposes of personal jurisdiction, the actions of an agent may be attributed to the principal").

Here, the record indicates that, even if Plaintiffs paid Pulk cash upon his delivery of the bike, there was a sufficient agency relationship to support imputing Pulk's contacts to Szal. "Apparent authority exists only if the plaintiff reasonably relied on the principal's words or conduct at the time [the plaintiff] entered the transaction that the agent is authorized to act on the principal's behalf." Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 745 (2000). Szal presented Pulk as an alternative to a third-party carrier who quoted a much higher price for shipment. D. 16 ¶ 26; D. 16-2 at 6–7. In his communications with Plaintiffs, Szal identified Pulk as "[o]ur shipper" and "[m]y shipper." D. 16-2 at 7; D. 16-3 at 1. Szal, rather than Pulk, informed Plaintiffs when Pulk would arrive to deliver the bicycle. D. 16-2 at 9–10. Upon arrival, Pulk informed Plaintiffs that "he does all of the deliveries and pickups for Buffalo Pedal." D. 16 ¶ 27. Under such circumstances, Plaintiffs reasonably believed that Pulk acted as Szal's agent in delivering the bicycle to Salem.

This case is thus distinguishable from Droukas and other cases wherein an independent carrier contracted to supply things into the Commonwealth. See Sullivan v. Leaseway Transp. Corp., No. CIV.A. 86-1389-H, 1988 WL 135434, at *8 (D. Mass. Dec. 14, 1988) (concluding that absent delivery terms in contract or "agency relationship" between seller and entity undertaking delivery § 3(b) did not apply); Droukas, 375 Mass. at 159 (noting that carrier was not acting as defendant's agent). Accordingly, because Pulk's agreement with Plaintiffs to supply the pedal bike in Massachusetts could be imputed to Szal, the Court concludes that § 3(b) is satisfied.

12

Given the Court's rulings as to § 3(a) and, alternatively, as to § 3(b) of the long-arm statute, the Court need not reach Plaintiffs' alternative argument that § 3(c) provides an independent basis for jurisdiction and proceeds to the due process inquiry.

**B.**   **Due Process Analysis**

Since Plaintiffs do not assert general jurisdiction, D. 15 at 10, the Court turns to whether the three requirements for specific jurisdiction are met here:  relatedness, purposeful availment, and reasonableness.  PREP Tours, Inc. v. Am. Youth Soccer Org., 913 F.3d 11, 17 (1st Cir. 2019).

*1.   Relatedness*

For relatedness, "the cause of action must arise from or relate to the defendant's contacts with the forum state."  Bluetarp Fin., Inc. v. Matrix Const. Co., 709 F.3d 72, 80 (1st Cir. 2013); see Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., __ U.S. __, 141 S. Ct. 1017, 1025–26 (2021).  In a contract action, a key consideration "is whether the defendant's forum-based activity was instrumental in the contract's formation or breach."  Id.  "Inferences can be drawn from the parties' 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'"  Id. (quoting Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 135 (1st Cir. 2006)).

Here, Salem Shift's claims sufficiently relate to Buffalo Pedal's contacts with Massachusetts.  Remote communications can be instrumental to the formation of a contract and satisfy the relatedness requirement.  See Mass. Sch. of Law, 142 F.3d at 36 (noting that "[t]he transmission of facts or information into Massachusetts via telephone or mail would of course constitute evidence of a jurisdictional contact directed into the forum state").  In Bluetarp Financial, the First Circuit found sufficient relatedness based upon a credit application faxed to Maine that created the contract allegedly breached.  Bluetarp Fin., 709 F. 3d at 80–82.  In this case, the parties

communicated by phone, text, and email to negotiate the purchase of the pedal bike, including numerous communications that Szal made into Massachusetts.  See D. 16-2; D. 16-3.  Szal knew throughout these communications that Salem Shift was based in Massachusetts and that he was working with Besse to produce a bike that she would use for her Massachusetts business.  See D. 16-2 at 2–3.

### 2.  *Purposeful Availment*

The closer call here is whether the Defendants purposefully availed themselves of this forum.  Purposeful availment turns upon "whether a defendant has 'deliberately target[ed] its behavior toward the society or economy of a particular forum [such that] the forum should have the power to subject the defendant to judgment regarding that behavior.'"  Baskin-Robbins, 825 F.3d at 36 (alteration in original) (quoting Carreras v. PMG Collins, LLC, 660 F.3d 549, 555 (1st Cir. 2011)).  "The main ingredients of purposeful availment are voluntariness and foreseeability."  Id.  "Achieving voluntariness demands that the defendant's contacts with the forum result proximately from its own actions."  Kuan Chen, 956 F.3d at 59; see Adelson v. Hananel, 510 F.3d 43, 50 (1st Cir. 2007) (explaining that "contacts must be voluntary and not based on the unilateral actions of another party").  Foreseeability is satisfied if the nonresident defendant "should reasonably anticipate being haled into court [in the forum state].'"  Kuan Chen, 956 F.3d at 59 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985)).

As averred in the Szal declaration, Defendants did not solicit business in Massachusetts, advertise in Massachusetts or maintain any assets in Massachusetts.  D. 11-4 ¶¶ 19–21, 26–27, 30.  Although Besse characterizes Buffalo Pedal's online presence as "advertising" in her declaration, D. 16 ¶ 6, the relevant exhibit shows merely that the Buffalo Pedal website was accessible by a Massachusetts resident D. 16-1.  "[F]or website activity to support the exercise of personal

jurisdiction, '[s]omething more is necessary, such as interactive features which allow the successful online ordering of the defendant's products.'" Cossaboon v. Maine Med. Ctr., 600 F.3d 25, 35 (1st Cir. 2010). Here, purposeful availment cannot be based upon the acccessibility of the Buffalo Pedal website, as Besse could not complete a purchase of the group pedal bike using the website alone and Buffalo Pedal's website and Defendants' marketing was not targeted towards Massachusetts residents. See e.g., Motus, LLC v. CarData Consultants, Inc., 23 F.4th 115, 125 (1st Cir. 2022) (concluding that no purposeful availment existed where company maintained informational website that allowed Massachusetts residents to reach out to company, though none ever did); Vu v. RSI Racing Sols., Inc., No. 19-CV-00680-LM, 2019 WL 5213328, at *5 (D.N.H. Oct. 16, 2019) (citing Cossaboon, 600 F.3d at 35) (holding that website, which may have been interactive, did not satisfy purposeful availment where "it is not clear whether consumers can actually complete a transaction using the website" and plaintiff contacted defendant via email); Photographic Illustrators Corp. v. A.W. Graham Lumber, LLC, 196 F. Supp. 3d 123, 131 (D. Mass. 2016) (concluding that mere availability of website allowing for product sales in all fifty states without targeting Massachusetts in any way does not establish purposeful availment).

Whether there was purposeful availment here thus turns on Defendants' communications with Plaintiffs and sale of the pedal bike to Salem Shift. This sale was Defendants' only sale of a pedal bike or other equipment to a Massachusetts resident. D. 11-4 ¶ 30. Defendants describe this case as "a stream of commerce" case and argue that the sale of a single product in Massachusetts, without more, does not indicate purposeful targeting of Massachusetts. D. 11 at 11–12; D. 23 at 2– 3. The quintessential stream of commerce sale involves the use of a distributor or website to make a product nationally available, and in such cases a "regular flow" of products or targeted marketing is required to show purposeful availment of any particular forum. Douglas Co., Inc. v. My

Brittany's LLC, No. 19-CV-1234-SM, 2020 WL 2768973, at *5 (D.N.H. May 28, 2020) (concluding that "[t]hree sales into New Hampshire . . . totaling less than $160" of stuffed toy animals through Amazon.com did not establish purposeful availment); see Photographic Illustrators, 196 F. Supp. 3d at 130–31 (concluding that sale of a single shovel via a family-owned Kentucky lumber business's interactive website was not sufficient to establish purposeful availment); Killion, 421 F. Supp. 2d at 257 (concluding that manufacturer did not establish minimum contacts with Massachusetts when its distributor sold one of manufacturer's boats to plaintiff).

Here, Defendants voluntarily pursued this sale over the course of several months, reaching out to Besse on numerous occasions to advance the sale with full knowledge that Salem Shift was based in Massachusetts and intended to purchase the bike for activities in Massachusetts.  See D. 16-2 at 2–4; Bluetarp Fin., 709 F.3d at 82 (concluding that defendant's forum contacts were "voluntary to the extent that it knowingly entered into a credit relationship with a company that it knew (it was clear on the account agreement's face) was located in [forum]"); Smith v. MCBC Hydra Boats, LLC, No. CV 16-11369-LTS, 2017 WL 3977526, at *2, 7 (D. Mass. Sept. 7, 2017) (concluding that purposeful availment existed where Florida boat dealership "purposefully reached out of Florida to solicit [buyer] in Massachusetts" for sale of single recreational boat, after buyer attended Miami boat show).  The pedal bike was not a ready-made consumer good placed into the stream of commerce which fortuitously landed in Massachusetts, but rather a customized product which Defendants sold directly to Salem Shift.  See D. 16-2 at 4, 6, 8 (discussing "customization options" including awning lights); D. 16-3 at 1 (discussing color scheme and need to order specific lights).  The parties' relationship also extended past Plaintiffs' agreement to purchase the bike, as the bike was not completed and ready for delivery until more than a month after the invoice was

sent.  D. 16 ¶¶ 20–25; see Smith, 2017 WL 3977526, at *7 (citing the defendant's post-sale service

of the vessel thus "creating a continuing relationship with the forum" in finding purposeful

availment). In addition, the invoice itself provided for "30-day parts and customer support."  D. 11-

5.  Given that the Defendants negotiated directly with a Massachusetts company for the sale of a

customized product, arranged for delivery of that product to Massachusetts and provided customer

support to its Massachusetts buyer, Defendants could reasonably be expected to be haled into Court

in Massachusetts in connection with the sale.  Woods Hole Oceanographic Inst. v. ATS Specialized,

Inc., No. CV 17-12301-NMG, 2019 WL 1276124, at *19 (D. Mass. Mar. 20, 2019) (concluding

that there was purposeful availment where transportation broker "did not . . . merely place a product

in the stream of commerce that happened to end up in Massachusetts" where it arranged for freight

originating in Massachusetts "to be loaded in Massachusetts and then transported by truck from

Massachusetts"); Levin v. Harned, 304 F. Supp. 2d 136, 151 (D. Mass. 2003) (concluding

"defendants reasonably could be expected to be haled into court in Massachusetts because they

knew that the ultimate purchasers [of antiques] were forum residents" and defendants made false

representations about the antiques to plaintiff's agent); Marine Charter & Storage Ltd., Inc. v.

Denison Marine, Inc., 701 F. Supp. 930, 934–35 (D. Mass. 1988) (concluding that purposeful

availment was satisfied based upon extensive negotiations between Massachusetts buyer and

Florida seller over sale of a custom built yacht and "extensive post-execution relationship"); see

also Rodríguez-Rivera v. Allscripts Healthcare Sols., Inc., 43 F.4th 150, 165 (1st Cir. 2022)

(explaining that "standard stream-of-commerce analysis usually involve[s] entities who cannot

necessarily predict or control where downstream their products will land; [and] intervening actors

like distributors may take the products to unforeseeable markets" (internal citation and quotation

marks omitted)); N. Costa, LLC v. 115 Mgmt., Inc., No. 20-1468 (BJM), 2022 WL 4115634, at *4

(D.P.R. Sept. 9, 2022) (concluding that defendants' sale after several days of negotiations, where defendants were aware that products were for sale in Puerto Rico, shipped them there and knew the ultimate buyers would be residents there, constituted purposeful availment).

Defendants make much of the fact that Besse initiated contact and inquired about the sale of the pedal bike.  While Besse did make the initial inquiry, such action is not dispositive. See Sigros v. Walt Disney World Co., 129 F. Supp. 2d 56, 68 (D. Mass. 2001) (concluding that plaintiff's initiation of contact with Disney did not make Disney's communications with her involuntary); Sonnabend v. Sorrentino, 866 F. Supp. 651, 653 (D. Mass. 1994) (concluding that purposeful availment existed where seller shipped painting to Massachusetts warehouse and ordered warehouse to release painting to Massachusetts buyer, even though Massachusetts party initiated extended transaction); Marine Charter, 701 F. Supp. at 933 (explaining that "which party initiated negotiations is not dispositive of purposefulness").  Marine Charter is instructive.  In that case, this Court concluded that a Florida boat builder purposefully availed itself of Massachusetts, even though the Massachusetts buyer originally initiated the transaction and in-person meetings took place in Florida.  Id.  The Court based its personal jurisdiction decision based upon the communications between the parties regarding the construction of the custom-built yacht, reasoning that "[b]uying a yacht does not involve the limited relationship between the passive purchaser and the seller of paper . . . , or even that of the buyer and seller of a car."  Id. at 935 (citation omitted). Instead "it is more akin to the relationship between a builder and an individual contracting to have a new house built."  Id.  Although the sale of the party bike here did not require negotiations quite as extensive as those in Marine Charter, the parties' contacts exceed those deemed insufficient in Droukas and REMF Corp, which involved the sale of already assembled products.  See Droukas,

375 Mass. at 151 (involving sale of two engines); REMF Corp, 60 Mass. App. Ct. at 905–06 (involving sale of existing yacht).

The present record shows that although Besse initiated contact with Defendants, Defendants repeatedly reached out to Besse over the course of almost six months regarding the sale of a customized bicycle which they knew would be used by a Massachusetts business to provide services to Massachusetts residents. D. 16-2 at 1–7. After Besse agreed to purchase the bike, Defendants maintained an ongoing relationship with Plaintiffs for another two months, communicating about customization of the bicycle, arranging shipment to Massachusetts via Defendants' preferred shipper and providing technical and customer support when the bike failed to function as expected. Id. 7–11; D. 16-3; see Smith, 2017 WL 3977526, at *7 (concluding that purposeful availment existed where defendant "established a continuing between itself and the forum").

Accordingly, the Court concludes that purposeful availment is satisfied in the present case.

3.      *Reasonableness*

To establish personal jurisdiction over Defendants, Plaintiffs must show that the exercise of jurisdiction is reasonable in light of the five Gestalt factors:  "(1) the defendant's burden of appearing [in the forum state], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 61 (1st Cir. 2016) (citation omitted) (alteration in original). Reasonableness "evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction" and vice versa. Ticketmaster, 26 F.3d at 209.

The first factor, the burden of Defendants appearing, "alone among the gestalt factors, is 'always a primary concern.'" Id. (quoting World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980)). "This factor is only meaningful where a party can demonstrate some kind of special or unusual burden," given that "staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly." Hannon v. Beard, 524 F.3d 275, 285 (1st Cir. 2008) (quoting Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994)). Typically, this Court does not find that the burden of appearing across state lines is special or unusual. See Hannon, 524 F.3d at 285 (concluding that it was reasonable for Pennsylvania defendant to appear in Massachusetts); Pritzker, 42 F.3d at 64 (concluding that it was reasonable for New York defendant to appear in Puerto Rico).

Defendants nevertheless argue that a special or unusual burden exists due to the small size of their business. D. 23 at 3–4 (citing Photographic Illustrators, 196 F. Supp. 3d at 132). The Defendants assert several facts regarding the size and operation of Buffalo Pedal in their supplemental memorandum, D. 23 at 3–4, without reference to any declaration supporting same. See Barrett v. Lombardi, 239 F.3d 23, 27 (1st Cir. 2001) (stating that "allegations in a lawyer's brief or legal memorandum are insufficient, even under the relatively relaxed prima facie standard, to establish jurisdictional facts"). Instead, Defendants attach text messages between Szal and Pulk arranging the pickup of the pedal bike, in which Pulk requests advance notice of the date on which he would need to drive to Salem and pick up the truck. D. 23 at 4 (citing D. 23-1 at 2). The Court declines to infer that the conduct of this litigation would impose an unusual burden on Defendants' business merely because Pulk objected to driving between Buffalo and Salem with only two days' notice. Id. Even if the Court were to credit Defendants' assertions of burden based upon the size their operation, any such burden could be minimized by remote participation for depositions, for one example. Linkco, Inc. v. Nichimen Corp., 164 F. Supp. 2d 203, 214–15 (D. Mass. 2001)

(recognizing that video conferencing would minimize discovery related burdens where key witnesses were located in Japan).  The Court concludes this factor favors Plaintiffs.

For the second factor, "Massachusetts certainly has an interest in deciding suits involving its corporations." Griffiths v. Aviva London Assignment Corp., 187 F. Supp. 3d 342, 349 (D. Mass. 2016).  This factor thus favors Plaintiffs, who are domiciled here.

For the third factor, the Court "must accord [Salem Shift's] choice of forum a degree of deference in respect to the issue of its own convenience," although some of the key witnesses and evidence may be in New York.  Ticketmaster, 26 F.3d at 211.

The fourth factor is merely neutral here; both this court and New York courts are positioned to resolve this case effectively.  See Crowe v. Harvey Klinger, Inc., 277 F. Supp. 3d 182, 194 (D. Mass. 2017) (noting the fourth fact "is generally considered 'a wash'" (quoting Baskin–Robbins, 825 F.3d at 41)).

Similarly, the fifth factor, substantive social policy, is not compelling in either direction as both Massachusetts and New York have a common interest in promoting a healthy business environment as to their respective residents.

Accordingly, the balance of these factors weighs in Plaintiffs' favor and having this case proceed in the forum of Plaintiffs' choosing comports with due process.

**VI.    CONCLUSION**

For the aforementioned reasons, the Court DENIES Defendant's motion to dismiss, D. 10.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge